1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| 7 ALBERT ANTHONY ARTEAGA, | Case No.  19-cv-05725-JCS |
| 8 Plaintiff, | |
| 9 v. | **ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 10 CITY OF OAKLEY, et al., | Re: Dkt. No. 45 |
| 11 Defendants. | |

## I.     INTRODUCTION

This case arises from Plaintiff Albert Arteaga's arrest, prosecution, and acquittal for resisting a police officer.  Arteaga asserts claims for malicious prosecution and violation of his rights under the First and Fourth Amendments.  With claims against other defendants having been dismissed, Defendant Daniel Buck, a police officer for the City of Oakley, is the only remaining defendant.  Buck moves for summary judgment only as to Arteaga's First Amendment retaliation claim and his malicious prosecution claim, arguing that he had probable cause to arrest Arteaga or at least is protected by qualified immunity.  The Court finds the matter suitable for resolution without oral argument and VACATES the hearing set for April 16, 2021.  For the reasons discussed below, Buck's motion is DENIED.[1]

The case management conference previously set for 9:30 AM on April 16, 2021 is CONTINUED to 2:00 PM the same day.

## II.     BACKGROUND

### A.     Factual Overview and Claims Asserted

Because the standard for summary judgment requires resolving disputed facts and

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    reasonable inferences in favor of the non-moving party, this order presents the relevant facts in the

2    light most favorable to Arteaga except where otherwise noted.  Buck's version of the facts differs,

3    including with respect to Arteaga's demeanor and the time before Buck fired his taser.  Nothing in

4    this order should be construed as resolving any issue of fact that might be disputed at trial.

5         Arteaga lived with his girlfriend Thalia Zazueta and his uncle Rudy McConahey at the

6    time of the events at issue.  Zazueta Decl. (dkt. 46-3) ¶ 1.  Zazueta called the police on November

7    9, 2017 to report that McConahey "was throwing things around and had threatened" her.  *Id.* ¶ 2.

8    A police dispatch log indicates Zazueta reported that McConahey tried to kick her head and would

9    not let her leave her bedroom.  Lagos Decl. (dkt. 46-1) Ex. A.  The transcript of Zazueta's call to

10   the dispatcher includes significant background noise, argument between Zazueta and McConahey,

11   and Zazueta's report that McConahey was "probably" drinking or using drugs, although Zazueta

12   stated that McConahey was not blocking the door to prevent her from leaving.  *See generally*

13   Blechman Decl. (dkt. 45-1) Ex. B.  Arteaga was recovering from hand surgery at the time and was

14   trying to sleep.  Zazueta Decl. ¶ 2; Arteaga Decl. (dkt. 46-2) ¶ 3.

15        Buck received a "report of a domestic disturbance where the male was reported threatening

16   the female caller," which he characterized as "a call for an emergency," and was informed by a

17   police dispatcher that the suspect was "a white male in his 50s, wearing shorts."  Blechman Decl.

18   Ex. A (excerpts of Buck's trial testimony) at 64:18–22; Lagos Decl. Ex. C (additional excerpts of

19   Buck's trial testimony) at 65:17–20.  He and his partner went to Arteaga's house, and after not

20   receiving an answer at the front door, followed a dispatcher's instruction to go to the back of the

21   house.  Lagos Decl. Ex. C at 67:1–4.  They began to walk up the back stairs and encountered

22   McConahey, who met the description provided by the dispatcher.  *Id.* at 67:14–21.  After

23   McConahey "said something unintelligible and fled back into the residence," Buck's partner

24   chased him inside, and "a couple of seconds" later, "they both essentially kind of spilled out into

25   the stairway area of the residence in a physical altercation."  *Id.* at 70:2–21.  While McConahey

26   was fighting with Buck's partner on the stairway, he "started to grab [Buck's] boot and . . . lower

27   legs," which, according to Buck, caused him to fear he would fall off the stairway.  *Id.* at 71:5–13.

28   Buck "conducted two to three strikes on Mr. McConahey to gain pain compliance to get him into

handcuffs"—specifically, he "kicked Mr. McConahey two or three times in the face." *Id.* at 71:14–15, 104:17–19. The "pain compliance" technique was successful, McConahey stopped resisting, and Buck's partner was able to secure one handcuff on McConahey when Buck noticed Arteaga in the doorway. *Id.* at 71:27–72:2, 104:20–22, 106:13–24; *see also* Lagos Decl. Ex. D at 27:12–23, 29:13–18 (Buck's deposition testimony that McConahey's "resistance had subsided" after Buck kicked his face, and that Buck later noticed that McConahey was bleeding from a cut above his eye).

Both Zazueta and Arteaga were in their bedroom when police arrived, but Arteaga got up when he heard McConahey crying. Zazueta Decl. ¶ 2; Arteaga Decl. ¶ 3. Arteaga opened the apartment door and saw McConahey outside on the middle landing of the apartment's rear staircase, in the fetal position with officers kicking his head and stomach. Arteaga Decl. ¶¶ 4, 10. McConahey was trying to protect his face and stomach. *Id.* ¶ 10.

Arteaga was wearing cutoff shorts without a shirt or shoes, and had nothing in his hands. *Id.* ¶ 5. He was standing fully inside the door of the apartment, at the top of the stairs, four steps above where the officers were kicking his uncle. *Id.* ¶¶ 11, 13–14 & Exs. B, D. "In a conversational tone of voice and before [he] had been ordered to do anything, [he] said to the officers, 'Okay, he's had enough.'" *Id.* ¶ 6. The two officers turned to look at him, and Buck drew his taser and aimed it at Arteaga. *Id.* ¶ 7. According to Arteaga, Buck shouted "'Get back or I will shoot' or 'Get in the house', 'I'm going to shoot', 'Freeze or I will shoot', or words to that effect." *Id.* Arteaga describes what happened next as follows:

> 7. . . . I froze because I didn't want to make any sudden moves. I did not want to risk getting shot. I did not know what Officer Buck had pulled and was pointing at me. I initially had my hands at my sides and then raised them to my head after he said whatever he said and pointed his taser at me.
>
> 8. Officer Buck immediately deployed his taser. I fell back into the hallway of the interior of my apartment against the bathroom door.
>
> 9. I estimate the time between when Officer Buck told me to get back into the house and pulled out his taser was 10 seconds or less. I was not given 15 – 30 seconds to obey the order to get back inside the house. I was already in the house.

*Id.* ¶¶ 7–9. At his deposition, Arteaga testified that Buck commanded him to "get back in the

3

house" twice in rapid succession, at least once accompanied by a warning that Buck "was going to shoot," Arteaga froze with his hands by his side, and Buck then shot him with the taser.  Blechman Decl. Ex. C (Arteaga Dep.) at 161:10–13.  Pressed by defense counsel to answer a hypothetical question of what would have occurred if he had jumped down the stairs towards the officers during the altercation, Arteaga testified that "[i]t would have escalated, and it would have been a lot worse."  Blechman Decl. Ex. C at 164:16–17.

Arteaga conceded that he could have stepped into the house in less than five seconds, but testified that he froze up when Buck aimed the taser at him:

> Q. Would it have taken you more than five seconds to step back into the house?
>
> MR. LAGOS: Object. That question is asking for speculation.
>
> THE WITNESS: What happened was –
>
> BY MR. RIPOLI:
> Q. I'm asking you a simple question. It's your house. You're at that doorway all the time. And I'm asking you would it have taken you more than five seconds to step back into your house?
>
> A: No.
>
> MR. LAGOS: Objection. Asking for speculation.
>
> THE WITNESS: No. What I seen was his eyes, and I don't know what it was, but I didn't want to move fast because he has something pointed at me.
>
> BY MR. RIPOLI:
> Q. So you heard Officer Buck's orders to get back in the house; correct?
>
> A. I did real fast, and I didn't even know what he was saying exactly, but I just knew that -- I could just imagine what to do, but I couldn't move fast enough.
>
> Q. And you understood that he was asking you to get back into the house, correct?
>
> A. Not right away, no.
>
> Q. Do you agree that you would have been safer if you had moved back into the house?
>
> A. Be safer? I was inside the house. I was on the inside of my threshold. Would it be safer? It would be safer if I didn't get out there at all.

United States District Court
Northern District of California

1

2

3

> Q. So you agree that the further in your house you are, the safer?
>
> A. I was in the hallway. There's no other way besides inside my bathroom.

4

5

6

*Id.* at 166:18–167:25.  Arteaga's testimony at his criminal trial was similar: he froze when Buck aimed the taser at him, because he feared Buck would shoot him if he moved, and Buck shot him with the taser within ten seconds.  Blechman Decl. Ex. D at 47:17–48:17, 50:6–27, 57:11–58:7.

7

8

Zazueta, who could see Arteaga from where she was standing inside the apartment, describes the events similarly:

9

10

11

12

> 6. At the back door, and, while Albert was standing inside our apartment, he said, "Okay, he's had enough." He did not scream or yell this. He said "Okay, he's had enough" in a normal conversational tone. I then heard someone tell Albert "Go back inside" following which point Albert, suddenly, put his hands up and then I saw him fall on his back in our hallway while his arms were still up in front of him.

13

14

> 7. From the time that Albert said, "Okay, he's had enough" to the time he was tased, it was under 10 seconds. It happened very quickly. Albert was not given 15 to 30 seconds to obey the order I heard to go back inside before he was tased.

15

Zazueta Decl. ¶¶ 6–7.

16

17

Buck's report of the incident differs in some respects, primarily as to the amount of time before he fired his taser:[2]

18

19

20

21

> I looked up towards the door way of the residence and observed a Hispanic male (Albert Arteaga) standing near the doorway yelling. I yelled at Albert to go back inside the house which he refused to do. Officer Wayne was still struggling to place Mcconahey [sic] into a second handcuff, and Officer Wayne's attention was on controlling Mcconahey.

22

> I was aware of the following at this time in regards to contacting Albert:

23

24

25

26

27

28

---

[2] In addition to testimony, Arteaga offers data downloaded from Buck's taser as evidence of the time between Buck arming his taser and firing it, which seems to suggest a period longer than the five to ten seconds that Arteaga and Zazueta recall, but shorter than the thirty seconds reported by Buck.  Lagos Decl. Ex. E.  Buck objects to that evidence as irrelevant and lacking foundation, but does not dispute that the motion should be decided based on the facts viewed in the light most favorable to Arteaga, including Arteaga's recollection of Buck allowing him only five to ten seconds to comply.  *See* Reply at 8–9; Mot. at 4, 11.  The Court therefore disregards the taser data sheet as irrelevant to the present motion, since both parties agree that Arteaga's recollection of the length of time should control in this context.

> \*Albert had not yet been searched for weapons.
> \*Albert appeared to be a healthy, physically fit male.
> \*Albert was refusing Officers basic commands.
> \*Albert was clearly delaying and obstructing a Police investigation.
>
> I drew my Department issued X-26 Taser and pointed it at Albert's upper chest area. I disengaged the safety, placed the red dot on his upper chest and gave him a lawful order to step back in the residence. Albert yelled something about his uncle being kicked. Albert was given ample opportunity to comply with my lawful commands, however he elected to blatantly ignore simple orders. I gave Albert approximately 30 seconds to comply however, Albert was uncooperative and refused to comply. I was in fear for my safety at this time as well as my partners. I advised "Taser" and subsequently discharged my Taser.
>
> Both Taser probes made contact with Albert's upper chest area and lower abdomen area. Albert fell backwards down to the floor inside the residence. After Officer Wayne handcuffed Mcconahey, he was able to place Albert into handcuffs without further incident. Albert did not wish to provide a statement to me about the incident.

Blumberg Decl. (dkt. 46-4) Ex. B at ECF p. 15.[3]

Buck's trial testimony was similar, and he explained that he did not feel safe and "didn't want to play the chance of possibly getting attacked by a second person while on the staircase" when they had not yet handcuffed McConahey, but he conceded that he was not sure whether Arteaga crossed the threshold of the door, that Arteaga was not advancing towards him when Buck told Arteaga to go inside, and that Arteaga froze and "[t]here was no escalation of violence" when Buck pointed his taser at him. Blechman Decl. Ex. A at 71:27–73:21, 108:1–24, 110:1–26, 117:15–17; *see also* Lagos Decl. Ex. D (Buck's similar deposition testimony). Buck testified at his deposition that McConahey was fully handcuffed by the time Buck gave Arteaga a second order to go inside and drew his taser, Lagos Decl. Ex. D at 36:1–17, but because he had not yet been searched or detained in a patrol car, Arteaga's failure to follow Buck's "simple lawful order . . . to go back inside the residence" delayed and obstructed the police investigation, *id.* at 40:17–41:1. At his deposition, Buck noted multiple times that he was not able to recall the exact sequence of events, in one instance noting that "[i]t all happened within a matter of seconds." *Id.* at 37:17–19; *see also id.* at 44:6–8 ("I don't recall the specific chain of events, whether it was right

---

[3] Because this exhibit consists of multiple documents with different pagination, this order cites the page numbers assigned by the ECF filing system.

1    after or not."). He also could not recall Arteaga's tone of voice or specifically what Arteaga said,

2    other than that it pertained to his uncle being kicked. *Id.* at 49:4–24.

3       Buck's police report includes at least one measurable inaccuracy, in that Buck described

4    the stairway where the altercation occurred as "over 30' from the ground," Blumberg Decl. Ex. B

5    at ECF p. 14, whereas Arteaga states in his declaration that he measured the top of the stairway as

6    only seven and a half feet and the middle landing as only five and a half feet from the ground, and

7    photographs attached to his declaration are generally consistent with those lower heights, Arteaga

8    Decl. ¶ 15 & Ex. D.[4] At trial, Buck testified that the it "was a very old wooden staircase that was

9    approximately maybe 30 to 40 feet high at the top." Lagos Decl. Ex. C at 67:10–12. At his

10    deposition for this case, he testified that he was no longer confident that the stairway was thirty

11    feet high, and that his ability to estimate distance, height, and time was "okay" or "fair." Lagos

12    Decl. Ex. D at 22:22–23:10.

13       Contra Costa County Deputy District Attorney Mary Blumberg made the decision to

14    charge Arteaga with a violation of California Penal Code § 148(a)(1) based on the contents of the

15    police reports, as well as related sources like a dispatcher's observations during Zazueta's call,

16    without the district attorney's office conducting an independent investigation. Blumberg Decl.

17    ¶¶ 4–5. Arteaga was acquitted at trial on July 19, 2019. Arteaga Decl. ¶ 16.

18       Arteaga brought this action in September of 2019 asserting the following claims: (1) a

19    claim under 42 U.S.C. § 1983 against Buck and his partner Garrett Wayne, based on violation of

20    Arteaga's First Amendment right to be free from retaliation against speech and his Fourth

21    Amendment rights to be free from unreasonable searches and seizures, unreasonable force, and

22    fabricated evidence, Compl. (dkt. 1) ¶ 23; (2) a claim under § 1983 and *Monell v. Department of*

23

---

[4] At his deposition, Arteaga agreed that he was "about 8.5 vertical feet" from McConahey during the struggle, which would not be consistent with his measurements or the photographs if it is interpreted as a different in elevation from the landing to the doorway where he was standing, but it is not clear whether Arteaga understood the question as such, rather than absolute distance between him and the officers. *See* Blechman Decl. Ex. C (Arteaga Dep.) at 159:13–160:17. Arteaga also confirmed that he was "four of five stairs" above the altercation, which is consistent with the photographs. *Id.* at 159:8–12. Viewing the evidence in the light most favorable to Arteaga for the purpose of Buck's motion for summary judgment, the Court accepts the heights stated in Arteaga's declaration.

1   *Social Services*, 436 U.S. 658 (1978) seeking to hold the City of Oakley and its police chief liable

2   for those alleged violations, Compl. ¶¶ 31–38; and (3) a claim for malicious prosecution against

3   Buck and Wayne, *id.* ¶¶ 39–46.  The Court previously dismissed Arteaga's *Monell* claims against

4   the City of Oakley and his supervisory liability claims against the Oakley Chief of Police.  *See*

5   Order re Mot. to Dismiss (dkt. 21).[5]  Although the Court granted Arteaga leave to amend those

6   claims, he did not file an amended complaint within the time allowed.  The parties later stipulated

7   to dismiss Arteaga's claims against Wayne.  *See* dkts. 34, 35.

8       **B.   Arguments**

9       Buck argues that he is entitled to summary judgment on Arteaga's malicious prosecution

10  claim because he had probable cause to arrest Arteaga and it was reasonable for Buck to believe

11  that Arteaga was willfully resisting, delaying, or obstructing Buck's performance of his duties by

12  failing to follow the order to go inside, Mot. (dkt. 45) at 7, 9–11, and because the prosecutor's

13  decision to bring charges was a superseding cause of the prosecution, *id.* at 8–9.  He contends that

14  he is entitled to summary judgment on Arteaga's First Amendment retaliation claim because such

15  a claim requires the absence of probable cause to arrest, and to the extent Arteaga might assert a

16  right to observe his uncle's arrest, the Supreme Court has rejected that theory.  *Id.* at 11–13.  Buck

17  argues that even if he lacked probable cause to arrest Arteaga, he is entitled to qualified immunity

18  because it is "reasonably arguable" that there was probable cause.  *Id.* at 13–14.

19      Arteaga argues that summary judgment is not appropriate because the claims at issue, as

20  well as the question of qualified immunity, turn on disputed issues of fact.  Opp'n (dkt. 46) at 7–8.

21  He contends that his malicious prosecution claim should proceed based on the theory that Buck

22  falsified portions of his police report, including the time before he fired his taser and the height of

23  the stairway off the ground.  *Id.* at 8–10.  He argues that there was no probable cause to arrest

24  because neither speech critical of an officer's conduct nor mere delay in following orders can

25  support a charge for interfering with an officer under section 148 of the Penal Code.  *Id.* at 10–12.

26  Arteaga contends that Buck's order was not lawful, and that the facts of this case would not have

27

28  _____

[5] *Arteaga v. City of Oakley*, No. 19-cv-05725-JCS, 2020 WL 511876 (N.D. Cal. Jan. 31, 2020).

United States District Court
Northern District of California

given Buck any reason to believe that Arteaga specifically intended to interfere with Buck carrying out his duties. *Id.* at 13–14. Arteaga also argues that Buck is not entitled to summary judgment based on qualified immunity, because the prohibitions against arrest without probable cause or in retaliation for speech are clearly established. *Id.* at 15–19.

Buck argues again in his reply that "a reasonable, prudent officer would believe that [Arteaga] committed a violation of Section 148(a)(1) when he willfully refused to comply with two lawful commands to step back from scene of two officers struggling to detain a large, resistive man accused of domestic violence." Reply (dkt. 47) at 2. Buck contends that the record does not support an inference that he lied in his police report, and that even if it did, "lying about the facts of an arrest does not necessarily destroy probable cause." *Id.* at 2–3. According to Buck, Arteaga's "non-compliance with simple, lawful commands" supports a reasonable inference that Arteaga "was willfully resisting, obstructing or delaying the performance of his duties by diverting Officer Buck's attention away from the arrest," such that Buck had probable cause to arrest Arteaga. *Id.* at 3. Buck notes that Arteaga conceded that he could have retreated further into the house in the time before Buck fired his taser, and argues that even if Arteaga was in fact unable to move due to shock or fear, Buck had no way to know that. *Id.* at 3–4. He contends that section 148 does not require "'forcible interference with an officer's activities,'" and that some of the cases on which Arteaga relies are distinguishable. *Id.* at 4–6 (quoting *In re Muhammad C.*, 95 Cal. App. 4th at 1329–30 (2002)). According to Buck, the arrest was based on Arteaga's failure to follow orders, not retaliation for Arteaga's speech. *Id.* at 6–7. Buck also argues that he is entitled to qualified immunity because Arteaga "has not pointed to a single case indentifying [sic] that an officer cannot arrest a person who has failed to comply with his or her lawful command, particularly where that person is attempting to interfere with a lawful arrest of another person," and because Ninth Circuit and Supreme Court decisions have rejected First Amendment claims by individuals who refused orders to leave the scene of an arrest. *Id.* at 7–8.

## III.    ANALYSIS

### A.    Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court "'to scour the record in search of a genuine issue of triable fact.'" *Id.* (citation omitted); *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### B.   Probable Cause to Arrest

Buck argues that he is entitled to summary judgment on both Arteaga's First Amendment

United States District Court
Northern District of California

1   retaliation claim and his malicious prosecution claim because there was probable cause for Buck

2   to arrest Arteaga for violation of section 148(a)(1).  Viewing the facts in the light most favorable

3   to Arteaga, there was not.

4        Probable cause turns on objective review of the circumstances of an arrest:

5          An officer has probable cause to make a warrantless arrest when the
       facts and circumstances within his knowledge are sufficient for a
6          reasonably prudent person to believe that the suspect has committed
       a crime. *Crowe v. County of San Diego*, 608 F.3d 406, 432 (9th Cir.
7          2010) . . . . The analysis involves both facts and law. The facts are
       those that were known to the officer at the time of the arrest. The law
8          is the criminal statute to which those facts apply.

9   *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011).

10       The criminal statute at issue here reads in relevant part as follows:

11         Every person who willfully resists, delays, or obstructs any . . . peace
       officer . . . in the discharge or attempt to discharge any duty of his or
12         her office or employment, when no other punishment is prescribed,
       shall be punished by a fine not exceeding one thousand dollars
13         ($1,000), or by imprisonment in a county jail not to exceed one year,
       or by both that fine and imprisonment.
14

15  Cal. Penal Code § 148(a)(1).  The elements of the offense are: "'(1) the defendant willfully

16  resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the

17  performance of his or her duties, and (3) the defendant knew or reasonably should have known

18  that the other person was a peace officer engaged in the performance of his or her duties,'" with an

19  additional requirement that officer's conduct must be lawful.  *Smith v. City of Hemet*, 394 F.3d

20  689, 695 (9th Cir. 2005) (citation omitted).  "The offense is a general intent crime, proscribing

21  only the particular act (resist, delay, obstruct) without reference to an intent to do a further act or

22  achieve a future consequence."[6]  *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1329 (2002).  Mere

23  delay in following a police officer's instruction, however, is not a violation of section 148.  *People*

24  *v. Quiroga*, 16 Cal. App. 4th 961, 966 (1993) ("It is true that [the criminal defendant] complied

25  slowly with [a police officer's] orders, but it surely cannot be supposed that Penal Code section

26  148 criminalizes a person's failure to respond with alacrity to police orders."); *see also Mackinney*

27

28  [6] Arteaga's suggestion that the statute requires *specific* intent, Opp'n at 14, is inconsistent with all
published California decisions of which this Court is aware.

United States District Court
Northern District of California

1   *v. Nielsen*, 60 F.3d 1002, 1007–08 (9th Cir. 1995) (relying on *Quiroga* to hold that an arrest for

2   delayed compliance with an order lacked probable cause, and that the defendant officer was not

3   entitled to qualified immunity).

4           In *Quiroga*, a police officer entered an apartment while investigating a noise complaint and

5   observed suspected illegal drug use.  16 Cal. App. 4th at 964.  The defendant "stood up from a

6   couch and started to walk into the hallway.  'Mostly for safety reasons,' [the officer] ordered him

7   to sit back down on the couch.  [The defendant] argued before complying with the order."  *Id.*  A

8   short time later, when the officer ordered him to place his hands in his lap, "he was 'very

9   uncooperative' but 'finally' obeyed the order," and when the officer ordered him to stand up, he

10  "refus[ed] several times" before ultimately complying when the officer pulled on his arm.  *Id.*  The

11  appellate court held that the defendant's pre-arrest conduct could not "justify a charge of violating

12  Penal Code section 148," but allowed the charge to stand based on unrelated later conduct: the

13  defendant's refusal to provide his name during a booking interview.  *Id.*

14          In *Mackinney*, the plaintiff was writing a statement critical of police in chalk on a public

15  sidewalk when officers in an unmarked car pulled over and ordered him to stop.  69 F.3d at 1004.

16  The plaintiff finished writing by underlining his message before turning to face the officers.  *Id.*

17  The defendant officer arrested him for violation of California Penal Code section 594, which

18  criminalized damaging property or defacing it "with paint or any other liquid."  *Id.* at 1004, 1005.

19  The district court held that the officer lacked probable cause to arrest under section 594, but had

20  probable cause to arrest under section 148 for obstruction.  *Id.* at 1005.  The Ninth Circuit

21  reversed, holding that the officer lacked both qualified immunity and probable cause under section

22  148 not only because the officers were in an unmarked car and "it was apparent that Mackinney

23  probably did not realize that the order he was failing to obey came from the police," but also

24  because he "refused to comply for only a few seconds," and "no reasonable officer could have

25  thought that complying with a police order slowly could be a violation of § 148."  *Id.* at 1006.  The

26  Ninth Circuit noted that "failure to comply immediately with an officer's requests is not a

27  violation of § 148 under *Quiroga*," and distinguished a case where a "plaintiff disobeyed the

28  officer *for a lengthy period of time* by keeping his car in a loading zone."  *Id.* at 1008 (emphasis

United States District Court
Northern District of California

1    added) (distinguishing *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1081 (8th Cir. 1990)).

2    Arteaga also relies on *Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013), a Ninth

3    Circuit decision considering an arrest under a substantially identical Washington law.[7]  There,

4    officers responded to a call that a man was attempting to commit suicide by sitting in his car with

5    a hose running from the exhaust pipe to the window, and that he was likely armed.  728 F.3d at

6    1089.  The officers tased that man after he stepped out of the car and refused to show his hands.

7    *Id.*  The plaintiff was a neighbor, Donald Blondin, who observed the incident and responded as

8    follows:

9          Blondin called out, "what are you doing to Jack?" He was standing
          some thirty-seven feet from Jack and the officers at the time, with
10         Jack's car positioned in between. At least two of the officers holding
          Jack yelled commands at Blondin: one instructed him to "get back,"
11         while another told him to "stop." According to a bystander watching
          the scene unfold, Blondin took one or two steps back and then
12         stopped. Blondin recalls that he simply stopped. Sgt. Shelton then ran
          towards Blondin, pointing a taser at him and yelling at him to "get
13         back." Blondin froze. The bystander testified that Blondin "appeared
          frozen with fear," and Defendants have conceded that he made no
14         threatening gestures.

15         Sgt. Shelton began to warn Blondin that he would be tased if he did
          not leave, but fired his taser before he had finished giving that
16         warning. Sgt. Shelton tased Blondin in dart mode, knocking him
          down and causing excruciating pain, paralysis, and loss of muscle
17         control. . . . Blondin was arrested and charged with obstructing a
          police officer, a charge that was ultimately dropped.

18

19    *Id.* at 1090 (footnote omitted).  The district court had granted summary judgment in favor of the

20    defendant officer, but the Ninth Circuit reversed because "Blondin did not continue to reapproach

21    after he was ordered to stop and get back," "[h]e did not persist in inquiring after his neighbor, . . .

22    there is no evidence that he was attempting to get the officers to stop what they were doing," "[h]e

23    engaged in none of the acts [a previous case] found obstructionist," and, "like the plaintiff in

24

25    ─────────────────────
      [7] As recited by the Ninth Circuit, that law provides: "'A person is guilty of obstructing a law
26    enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement
      officer in the discharge of his or her official powers or duties.'"  *Gravelet-Blondin*, 728 F.3d at
27    1098 (quoting Wash. Rev. Code § 9A.76.020(1)).  The Ninth Circuit has considered its decision in
      *Mackinney*, which addressed section 148, as relevant precedent in at least two cases addressing the
28    Washington law, without noting any difference between the statutes.  *See Gravelet-Blondin*, 728
      F.3d at 1098–99; *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009).

13

1    *Mackinney*, Blondin failed to comply 'for only a few seconds.'" *Id.* at 1099.

2    The cases on which Buck relies involved more tangible interference with duties than

3    merely freezing in response to an order to step inside a house.  In *People v. Williams*, 26 Cal. App.

4    5th 71 (2018), the criminal defendant actively stepped between an officer and the person to whom

5    the officer was issuing a citation, "after the officers had instructed a pedestrian to go around," and

6    "ignored multiple requests and orders from the officers to sit down after they explained that

7    defendant was interfering with the citation process." 26 Cal. App. 5th at 92.   He "never complied

8    with the officers' numerous orders," and  "distracted Officer Brouillette during the citation

9    process, creating a reasonable concern for officer safety, and thereby delayed the officer in

10   completing the citation process." *Id.*  The juvenile defendant in *In re Muhammad C.* approached

11   another person who was detained in the back of a patrol car, refused multiple officers' instructions

12   to step away, extended a palm behind him towards the officers, and only walked away from the

13   patrol car when an officer crossed the street to approach him, resulting in a delay in the officers

14   searching the detainee's vehicle.  95 Cal. App. 4th at 1328.  The court affirmed his conviction

15   under section 148, distinguishing *Quiroga* on the basis that the defendant "affirmatively responded

16   to the police orders with defiance" when he "acknowledged the officers' orders with his hand

17   gesture yet continued his conversation with [the detainee]," and thus finding "more than a

18   temporary distraction" or "mere failure to respond." *Id.* at 1330.

19   Here, resolving all reasonable factual disputes and inferences in Arteaga's failure, the

20   following events occurred.  Buck and his partner responded to a domestic violence call and

21   encountered McConahey, who met the description of the suspect, acted erratically, and vigorously

22   resisted arrest.  Lagos Decl. Ex. C at 67:14–21, 70:2–21.  The officers attempted to subdue

23   McConahey on a landing of the back stairway five and a half feet above the ground, where

24   McConahey grabbed at Buck's ankles.  *Id.* at 71:5–13; Arteaga Decl. ¶ 15.  Arteaga came to the

25   door, but did not cross the threshold, and observed the officers kicking McConahey.  Arteaga

26   Decl. ¶ 4.  The officers did not notice him until he said, in a conversational tone of voice, "Okay,

27   he's had enough." *Id.* ¶¶ 6–7.  By this time, McConahey had stopped resisting, and one handcuff

28   had been fastened to him.  Lagos Decl. Ex. C at 71:27–72:2, 104:20–22, 106:13–24.  Buck looked

United States District Court
Northern District of California

14

up to see Arteaga, who did not meet the description of the suspect and was wearing nothing except shorts, with his hands empty.  Arteaga Decl. ¶ 5; Lagos Decl. Ex. D at 109:2–18.  Arteaga was a physically fit man weighing around 180 pounds, roughly the same weight as Buck.  Blumberg Decl. Ex. B at ECF p. 15; Blechman Decl. Ex. C at 158:10; Lagos Decl. Ex. C at 104:12.  His position at the door was two feet higher than the landing, around eight and a half to nine feet away.  Arteaga Decl. ¶¶ 10, 15.  Buck immediately pointed his taser at Arteaga and screamed at him to go inside or something to that effect, twice in rapid succession, accompanied by a warning that he would shoot, and perhaps also an order to freeze.  *Id.* ¶ 7; Blechman Decl. Ex. C at 161:10– 13.  By this time, McConahey was fully handcuffed.  Lagos Decl. Ex. D at 106:25–28.  Arteaga froze in fear with his hands by his side, and either did nothing or raised his hands to his head.  Arteaga Decl. ¶ 7.  He was still inside the house.  *Id.* ¶ 9.  He did not make any movement towards the officers.  Blechman Decl. Ex. A at 108:15–19; Lagos Decl. Ex. D at 109:23–28.  Less than ten seconds after Buck ordered him to go inside, Buck shot Arteaga with his taser, and subsequently arrested him for resisting, obstructing, or delaying the officers in violation of section 148.  Arteaga Dec. ¶¶ 8–9.

Under the rule of *Quiroga*—a case Buck does not acknowledge in any way in his briefs, even after Arteaga relied on it in his opposition—"failure to comply immediately with an officer's requests is not a violation of § 148."  *Mackinney*, 69 F.3d at 1008 (describing the holding of *Quiroga*).  Buck makes much of Arteaga's admission that it would have taken him less than five seconds to retreat further into his house, and thus by implication, less than the time between Buck's warning and firing the taser, even under Arteaga's version of that timeline.  *See* Mot. at 11; Blechman Decl. Ex. C (Arteaga Dep.) at 166:24–167:3.  But in *Quiroga*, the criminal defendant argued with the officer and repeatedly refused to follow the officer's instructions.  16 Cal. App. 4th at 964.  Neither the fact that the defendant *could* have complied more quickly, nor that the officer was motivated by "safety reasons" in ordering the defendant to sit down rather than walk into the hallway, altered the court's conclusion that such temporary disobedience was not a violation of section 148.  *See id.* at 964, 966.  Viewing the facts in the light most favorable to Arteaga, he caused no "more than a temporary distraction" through "mere failure to respond"—

conduct that the *Muhammad C.* court distinguished as insufficient to support a violation.  95 Cal. App. 4th at 1330.  While the defendant in *Quiroga* eventually complied and Arteaga did not (because Buck tased him within five to ten seconds of the order), that distinction is not relevant under *Gravelet-Blondin*—another case Buck wholly fails to address, despite Arteaga's reliance on it—where the plaintiff similarly presented evidence that an officer tased him when he froze rather than comply with an order to step back, and the Ninth Circuit held that the officer was not entitled to summary judgment.  728 F.3d at 1090, 1099.  Buck is therefore not entitled to summary judgment that he had probable cause to arrest Arteaga.

Even if, contrary to established caselaw, distraction caused by a brief and passive failure to follow an officer's command could support an arrest under section 148, it is not clear that such disobedience occurred here.  Construing all conflicting testimony in Arteaga's favor, Buck ordered Arteaga to go inside his house when he was already inside his house and fully behind the threshold of the door, and perhaps also ordered him to "freeze."  Arteaga Decl. ¶¶ 4, 7, 9; Blechman Decl. Ex. C (Arteaga Dep.) at 167:14–25.  Nor is it clear that Arteaga's failure to retreat further inside the house actually interfered with Buck performing any duty.  Buck himself testified that McConahey had stopped resisting after Buck kicked him and before Buck noticed Arteaga, and that his partner had McConahey fully handcuffed before Buck tased Arteaga.  Lagos Decl. Ex. C. (Buck's trial testimony) at 104:20–22, 106:10–20; Lagos Decl. Ex. D (Buck Dep.) at 29:13–18, 31:1–5, 36:1–17.  Buck testified that he was concerned about "possibly getting attacked" by Arteaga while he and his partner still "had [their] hands full with the first person," Lago Decl. Ex. C at 73:16–21, but a jury could conclude that the exigency of subduing a combative McConahey was complete by the time Buck ordered Arteaga to go inside, in which case it is not clear how Arteaga's mere presence in the doorway obstructed Buck and his partner from continuing with the arrest.  Regardless, *Quiroga* and its progeny settle the issue, foreclosing as a matter of law Buck's argument that "non-compliance with simple, lawful commands" alone supports a "reasonable . . . belie[f] that [Arteaga] was willfully resisting, obstructing or delaying the performance of [Buck's] duties" sufficient to arrest him under section 148.  *See* Reply at 3. The Court therefore need not decide whether Buck would be entitled to summary judgment if,

16

contrary to established law, a brief period of mere disobedience *could* establish probable cause under that statute.

### C.   Qualified Immunity as to Probable Cause

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In the context of an unlawful arrest, . . . the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum*, 663 F.3d 1071, 1076 (9th Cir. 2011). An officer who lacked probable cause to arrest may nevertheless be entitled to qualified immunity "if it was objectively reasonable for him *to believe* that he had probable cause," or in other words, if "reasonable officers could disagree about whether the facts in the particular case give rise to probable cause." *Id.* at 1078 & n.2. Qualified immunity does not, however, protect "an unreasonable decision or . . . an unreasonable mistake as to law or fact." *Id.* at 1078. "Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate." *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003); *see also*, *e.g.*, *Lopez v. Swaney*, 741 F. App'x 486, 488 (9th Cir. 2018) (quoting *Wilkins* for the same rule).

Buck's assertion that Arteaga "has not pointed to a single case indentifying [sic] that an officer cannot arrest a person who has failed to comply with his or her lawful command," Reply at 8, is simply false. *Mackinney* so held, where the Ninth Circuit held that a plaintiff underlining his written message rather than immediately complying with the command to stop writing did not provide probable cause to arrest under section 148. Buck argues that *Mackinney* is distinguishable based on Arteaga's awareness that Buck was a police officer, and based on the officers in that case clearly expressing their disregard for the plaintiff's civil rights, Reply at 5–6, but the Ninth Circuit did not rely on the officers' comments, and it presented the mere seconds-long failure to comply

United States District Court
Northern District of California

1  (without active resistance) as a sufficient reason for the outcome, separate from the question of

2  whether the plaintiff recognized that the command came from police.  *Mackinney*, 69 F.3d at

3  1006, 1007–08.  Buck does not address *Quiroga* and *Gravelet-Blondin*, both of which also held

4  that a brief period of mere disobedience does not support an arrest under section 148 (or the

5  equivalent Washington statute, which the Ninth Circuit treated as interchangeable).  Buck also

6  fails to acknowledge the portion of *Muhammad C.* emphasizing that the conviction was only

7  permissible because the trial court had sufficient evidence to find that the defendant's conduct was

8  "no mere failure to respond" and "more than a temporary distraction."  *Muhammad C.*, 95 Cal.

9  App. 4th at 1330.  The law is clear: "failure to comply immediately with an officer's requests is

10  not a violation of § 148 under *Quiroga*."  *Mackinney*, 69 F.3d at 1008.

11  Buck argues that there is a lack of relevant authority "particularly where that person [who

12  failed to follow orders] is attempting to interfere with a lawful arrest of another person," Reply at

13  8, but a jury viewing the facts in the light most favorable to Arteaga could conclude that he was

14  not "attempting to interfere," and did not take any action that would support a reasonable belief

15  that he was.  To the extent there would otherwise be any question about whether Arteaga's

16  conduct could support an arrest, it is dispelled by *Gravelet-Blondin*, which held that the district

17  court erred in granting summary judgment for a defendant officer who tased the plaintiff under

18  remarkably similar circumstances—including the plaintiff questioning officers' conduct while

19  they conducted a forcible arrest and failing to comply quickly with an order to back away—

20  because the record presented material questions of fact as to whether the officer had probable

21  cause to arrest.

22  ### D.    First Amendment Retaliation

23  Arteaga asserts his First Amendment claim based on a theory of retaliation for protected

24  speech.

25  As a general matter the First Amendment prohibits government
26  officials from subjecting an individual to retaliatory actions for
   engaging in protected speech. If an official takes adverse action
27  against someone based on that forbidden motive, and non-retaliatory
   grounds are in fact insufficient to provoke the adverse consequences,
28  the injured person may generally seek relief by bringing a First
   Amendment claim.

*Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citations, brackets, and internal quotation marks omitted). As Buck acknowledges, "[t]he public has the right to criticize police action and such verbal protests can not [sic] support an arrest under Section 148." Mot. at 12 (citing *Mackinney*, 69 F.3d at 1007). Buck does not dispute that Arteaga's statement that McConahey "had enough," made before Buck issued any order, falls within the protection of the First Amendment.

Buck argues that he did not tase and arrest Arteaga in retaliation for his speech, but instead due to Arteaga's failure to comply with his orders. *Id.* As discussed above, a reasonable jury could conclude that Buck lacked probable cause to arrest Arteaga for violation of section 148.[8] If the jury credited Buck's explanation for the arrest, it would not implicate the First Amendment, even if an arrest under California law for failure to follow orders promptly was unreasonable and violated the Fourth Amendment. But the jury is not required to credit Buck's testimony—particularly if it determines that he included other false statements in his police report and trial testimony. According to Arteaga, Buck drew his taser immediately after Arteaga suggested that the officers should stop kicking his uncle, and tased him within seconds. The Court cannot say as a matter of law that no reasonable jury could infer a causal relationship, even if other explanations might also be permissible.

Buck also argues that he is entitled to qualified immunity on Arteaga's First Amendment retaliation claim because courts have recognized that the First Amendment does not grant a right to refuse orders by police to leave the scene of an arrest. Reply at 6–8; Mot. at 11–13. Both of the cases he cites for that proposition considered arrests under laws that required such compliance.

In *United States v. Poocha*, 259 F.3d 1077 (9th Cir. 2001), criminal defendant Nolan Poocha was part of a crowd that protested as park rangers attempted to arrest someone else in Yosemite National Park. 359 F.3d at 1078–79. According to the prosecution's evidence, when a ranger told Poocha to disperse, Poocha responded, "fuck you," and did not leave. *Id.* at 1079. The Ninth Circuit held that Poocha's speech was protected by the First Amendment and reversed a

---

[8] Buck also argues that he is entitled to summary judgment on Arteaga's First Amendment retaliation claim because he had probable cause to arrest under section 148 and the claim requires an absence of probable cause, but as discussed above, the record could support a finding that Buck lacked probable cause. *See* Mot. at 11–12 (citing *Nieves*, 139 S. Ct. 1715).

United States District Court
Northern District of California

1    disorderly conduct conviction on that basis, *id.* at 1079–82, but affirmed his conviction for failing

2    to obey an officer as required by 36 C.F.R. § 2.32(a), noting that Poocha's comment, "though

3    protected by the First Amendment, indicates that he heard and understood Lober's order to leave

4    and willfully disobeyed it," *id.* at 1083.  The regulation at issue prohibited "'[v]iolating the lawful

5    order of a government employee or agent authorized to maintain order and control public access

6    and movement during . . . law enforcement actions.'"  *Id.* at 1083 n.6 (quoting 36 C.F.R.

7    § 2.32(a)(2)).

8         In *Colten v. Kentucky*, 407 U.S. 104 (1972), officers pulled over a driver for an expired

9    license plate after a political protest, defendant Lewis Colten and other protestors pulled to the side

10   of the road as well to observe the police activity, and Colten tried to speak to the officers and the

11   driver they had detained.  407 U.S. at 106.  Officers told Colten to leave several times, but he did

12   not, and insisted on staying to arrange transportation for the detained driver and his passengers.

13   *Id.* at 106–07.  Colten was charged and convicted of disorderly conduct, and argued (among other

14   objections) that the conviction violated his rights under the First Amendment.  *Id.* at 107–08.

15   Kentucky's disorderly conduct statute prohibited "refus[ing] to comply with a lawful order of the

16   police to disperse" from a congregation in a public place, "with intent to cause public

17   inconvenience, annoyance or alarm, or recklessly creating a risk thereof."  *Id.* at 108 (quoting Ky.

18   Rev. Stat. § 437.016(1)(f) (Supp. 1968)).  The trial court found as a factual matter that Colten

19   intended only "to cause inconvenience and annoyance."  *Id.* at 109.  The Supreme Court declined

20   to second-guess that finding, and characterized Colten's argument "that in seeking to arrange

21   transportation for [the other driver] and in observing the issuance of a traffic citation he was

22   disseminating and receiving information" as "a strained, near-frivolous contention," expressing

23   "little doubt that Colten's conduct in refusing to move on after being directed to do so was not,

24   without more, protected by the First Amendment."  *Id.*

25        Both the federal regulation in *Poocha* and the Kentucky statute in *Colten* specifically

26   required compliance with police officers' orders under the circumstances presented.  As discussed

27   above, section 148 of the California Penal Code did not require such compliance in the

28   circumstances assumed to be true for purposes of this motion, at least within a period of less than

United States District Court
Northern District of California

20

ten seconds.  And unlike the somewhat convoluted theory of protected speech in *Colten*—

arranging transportation and observing an arrest—Arteaga's comment here that McConahey had

"had enough" is a more straightforward critique of police conduct, which falls squarely within the

First Amendment.  *See Poocha*, 259 F.3d at 1082 ("Criticism of the police, profane or otherwise,

is not a crime."); *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995) ("These cases clearly

establish a First Amendment right to challenge the police.  Even when crass and inarticulate,

verbal challenges to the police are protected."); *see also Nieves*, 139 S. Ct at 1722 (discussing the

prohibition against retaliation for protected speech).[9]  If a jury concludes that Buck tased and

arrested Arteaga in retaliation for his comment, such retaliation would violate clearly established

law, and Buck would not be entitled to qualified immunity.  His motion for summary judgment is

therefore DENIED as to Arteaga's First Amendment claim.

### E.    Malicious Prosecution

Although malicious prosecution can also be asserted under state law, both parties' briefs

on the present motion address Arteaga's malicious prosecution claim as asserting a constitutional

violation asserted under § 1983.  Mot. at 6; Opp'n at 8.

> In order to prevail on a § 1983 claim of malicious prosecution, a
> plaintiff "must show that the defendants prosecuted [him] with malice
> and without probable cause, and that they did so for the purpose of
> denying [him] equal protection or another specific constitutional
> right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir.
> 1995). Malicious prosecution actions are not limited to suits against
> prosecutors but may be brought, as here, against other persons who
> have wrongfully caused the charges to be filed. *Galbraith v. County
> of Santa Clara*, 307 F.3d 1119, 1126–27 (9th Cir. 2002).

*Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (alteration in original).  State law

is relevant to such a claim, which "incorporate[s] the relevant elements of the common law tort of

malicious prosecution."  *Id.* at 1066.

---

[9] Buck argues that Arteaga had no right under the First Amendment to observe the arrest of
McConahey, but Arteaga has never asserted such a right, either in his complaint or his opposition
brief.  Arteaga's sole claim based on the First Amendment is that Buck tased and arrested him in
retaliation for exercising "the right to be profane, express criticism or opinion of the government
and/or government officials and/or public employees and/or to question a public official or
employee's job performance and/or the right to complain about government conduct," not any
right to observe an arrest.  Compl. ¶ 23(a).

United States District Court
Northern District of California

1    Buck challenges this claim on two grounds.  First, he argues that it fails because he had

2   probable cause to arrest.  Mot. at 7–8.  As discussed above, viewing the facts in the light most

3   favorable to Arteaga, Buck neither had probable cause nor is entitled to qualified immunity on that

4   issue.

5    Second, Buck argues that Arteaga cannot overcome the rebuttable presumption of

6   prosecutorial independence in charging decisions, which would break the causal chain between

7   any conduct by Buck and Arteaga's prosecution, although Buck does not pursue that argument in

8   his reply.  Mot. at 8–9; *see generally* Reply.  "However, the presumption of prosecutorial

9   independence does not bar a subsequent § 1983 claim against state or local officials who

10   improperly exerted pressure on the prosecutor, *knowingly provided misinformation to him*,

11   concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was

12   actively instrumental in causing the initiation of legal proceedings."  *Awabdy*, 368 F.3d at 1067

13   (emphasis added).  If the jury credits Arteaga's testimony that the landing was only five and a half

14   feet off the ground and that Buck fired his taser less than ten seconds after ordering Arteaga inside,

15   it could conclude that Buck provided false information when he reported that the "[o]fficers were

16   over 30' from the ground" during the confrontation and that he allowed Arteaga "approximately

17   30 seconds to comply."  Blumberg Decl. Ex. C at ECF pp. 14–15.  Particularly with respect to the

18   large discrepancy in height off the ground, a jury might conclude that the discrepancy was willful.

19   The prosecutor states in her declaration that the police report "and related information[,] such as

20   references to the dispatcher's observation during the 911 call," were the only basis for the decision

21   to charge Arteaga.  Blumberg Decl. ¶¶ 4–5.  Viewing the record in the light most favorable to

22   Arteaga, he has presented sufficient evidence to rebut the presumption of prosecutorial

23   independence.[10]

24    Buck's motion for summary judgment is therefore DENIED as to Arteaga's malicious

25   prosecution claim.

26

27   ──────────────────────
     [10] Of course, a jury might also conclude that any discrepancy was inadvertent or did not influence
28   the prosecution, but the only issue before the Court is whether Buck is entitled to summary
     judgment, not whether Buck could prevail at trial.

United States District Court
Northern District of California

**IV.     CONCLUSION**

For the reason's discussed above, Buck's motion for partial summary judgment is

DENIED.

**IT IS SO ORDERED.**

Dated: April 13, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge